# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| HUI KUN LI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:14-cv-00030 |
| | ) | |
| v. | ) | |
| | ) | By:  Michael F. Urbanski |
| JOHN E. SHUMAN, et al. | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

The parties to this case are former business partners in an Asian restaurant venture.

For more than five years, their business dispute has been the subject of extensive state

litigation, which remains pending in the Circuit Court for Frederick County, Virginia.

Plaintiffs Hui Kun Li, Jian Lu, and Mimosa Asian Fusion, LLC filed this concurrent federal

action in July 2014, raising fifteen claims against defendants John Shuman, Nicole Edwards

and Mimosa Restaurant, LLC.  All that remains of this federal case are two counts of

trademark infringement (Counts 1 & 2) and one count of misappropriation of trade secrets

in violation of Virginia Code § 59.1-336 (Count 15).[1]  This matter is now before the court on

the parties' cross-motions for summary judgment.

As set forth in detail below, Li's trademark infringement claims fail as a matter of law

because she is unable to prove secondary meaning.  In any event, Li used the marks

"Mimosa Asian Fusion" and ~~mimosa~~ in connection with the operation of Mimosa Asian

---

[1] Although Nicole Edwards was named as a defendant in the amended complaint, none of the three surviving claims in this case concern her.  Counts 1, 2, and 15 allege claims against Shuman and Mimosa Restaurant, LLC.  Additionally, while Mimosa Asian Fusion, LLC is a named plaintiff, none of the derivative claims survive.

Fusion, LLC, of which Shuman was a member. Li cannot assert trademark infringement against her former partner when their business dispute is still pending in state court and the various corporate assets and rights flowing therefrom have yet to be disentangled. Finally, as Lu cannot prove he derived independent economic value from his alleged "secret recipes," his misappropriation claim under Virginia Code § 59.1-336 also fails as a matter of law. Because there is no genuine issue of material fact to be resolved by a jury, defendants' motion for summary judgment (ECF No. 207) will be **GRANTED**, plaintiffs' motion for summary judgment (ECF No. 212) will be **DENIED**, and this case will be dismissed.[2]

## I.

There is no love lost between these former business partners, and each side has a story to tell. Plaintiffs Hui Kun Li and Jian "Jay" Lu, a mother and son, allege they opened an Asian restaurant as a family business, allowed defendant John Shuman to invest and become an equal partner in that business, and then Shuman stole the restaurant out from under them. For his part, Shuman claims his investment (which far exceeded the agreed-upon amount) and organizational management prevented the restaurant from closing its doors; yet one day, without warning, Lu shut it down and physically locked Shuman out of the restaurant, forcing him to reopen on his own. The resulting dispute has been the subject of ongoing litigation in state court since 2011, and the issues related to the dissolution of the partnership between Li, Lu, and Shuman are matters of state law pending before the Frederick County Circuit Court.

---

[2] As such, the pending motions in limine (ECF Nos. 179 & 205) will be **DENIED as moot**.

Case 5:14-cv-00030-MFU-JCH Document 252 Filed 12/09/16 Page 2 of 45 Pageid#: 6654

This parallel federal action has been narrowed significantly, leaving only claims of trademark infringement and misappropriation of trade secrets to be resolved by this court. Nevertheless, the underlying business dispute permeates all aspects of this federal litigation. Accusations about what led to the breakdown of the partnership and ensuing litigation abound in the parties' filings. Accordingly, a detailed factual history is warranted.

## A. Li forms Mimosa I

Mimosa Asian Fusion ("Mimosa I"), an Asian restaurant located at 202 Grocery Avenue in Winchester, Virginia, opened its doors in 2008. The restaurant was a joint venture between the family of plaintiff Hui Kun Li and her friend You Cheng. See Lu Dep., ECF No. 251, at 23-25. Cheng had previous experience in the restaurant industry; Li's experience was limited to her work at a McDonald's restaurant, at which she has been employed since 1986. Li Dep., ECF No. 208-2, at 8-11, 15. Cheng brought the restaurant-specific knowledge to the business, her husband Jun Hua Yang did the cooking, and Li's son, plaintiff Jian "Jay" Lu, managed the restaurant. Lu Dep., ECF No. 251, at 25-26; Li Dep., ECF No. 251, at 16, 6.

Li and Cheng secured a business license, ECF No. 213-22, as well as an ABC license, ECF No. 213-24, 214, and signed a five-year lease with a personal guaranty, ECF No. 214-1. The business took the form of a limited liability company, Mimosa Asian Fusion, LLC. ECF No. 214-7. As there was no operating agreement, the contours of the Li/Lu family and Cheng/Yang family partnership are rather unclear, as are the various ownership stakes in the

3

restaurant.[3]  Certain evidence in the record suggests Li and Cheng were equal owners of the restaurant.  See, e.g., Li Dep., ECF No. 208-2, at 13, 22; Lu Dep., ECF No. 208-3, at 24; Ex. 12 to Lu Dep., ECF No. 208-3; Ex. 2 to Li Dep., ECF No. 208-2.  Tax returns from 2008, however, show Li, Lu, Cheng, and Yang all owned 25% shares in the business.  Ex. 2 to Shuman Aff., ECF No. 208-11.

Together on the computer, Li and Lu designed the restaurant logo Li Dep., ECF No. 208-2, at 18; see also Lu Dep., ECF No. 208-3, at 36, which appeared on signs, menus, gift cards, and advertisements for Mimosa I, ECF No. 214-8; see also ECF No. 213-17 (signage details).  Li testified she came up with the name "Mimosa" for the restaurant because it is the name of a flower she likes.  Li Dep., ECF No. 208-2, at 18.  Lu testified that as "Mimosa" is also the name of a drink, a number of drinks by the same name were offered on the menu:  Mimosa Classic, Mimosa Moon, Mimosa Royale, Bubble Gum Mimosa, Fancy Panties Mimosa, DiSaronno Mimosa, Pina Colada Mimosa, Fiddler's Toast Mimosa, Peach Mimosa and Grand Mimosa.  Ex. 7 to Lu Dep., ECF No. 208-3; see also Lu Dep., ECF No. 208-3, at 36-37.  Lu explained:  "… I figure that if [the customers] see the name Mimosa, then perhaps in their mind it's related to drinks."  Lu Dep., ECF No. 208-3, at 41.

In addition to Mimosa drinks, the menu at Mimosa I incorporated dishes from across Asia as well as cooking styles from various regions of China.  Li Dep., ECF No. 208-2, at 25; Lu Dep., ECF No. 208-3, at 42.  Lu testified they tried to sell "some of the more popular Asian dishes" such as General Tso's chicken but also tried to differentiate the restaurant

---

[3] The record in this case is hampered by the parties' failure to observe corporate formalities throughout the existence and operation of Mimosa I.

4

from the typical Chinese take-out restaurant. Lu Dep., ECF No. 208-3, at 42-43. When Mimosa I opened, You Cheng and her husband Jun Yang were the chefs, and Li and Lu relied on their cooking experience and recipes. Li Dep., ECF No. 208-2, at 26; Lu Dep., ECF No. 208-3, at 43, 44. There was also a chef named Sonny working in the kitchen. Lu Dep., ECF No. 208-3, at 43.

In its first year of operation, the business claimed a loss of $42,517, Ex. 2 to Shuman Aff., ECF No. 208-11, and in early 2009, Li bought out Cheng's (and, presumably, Cheng's family's) interest in the restaurant. In a "Partnership Buy-out Agreement" dated March 10, 2009, Li purchased Cheng's ownership interest in Mimosa Asian Fusion, LLC for $82,500. Ex. 2 to Li Dep., ECF No. 208-2. An incomplete provision of the agreement states that "You Cheng or Jun Yang, agrees to remain employed at Mimosa Asian Fusion Restaurant as the executive chef until the complet [sic]." Id. Lu testified this cut-off provision "was really to protect us, that if we bought them out that they would—they would stay long enough to, I guess, pass on their experiences, their cooking methods off to me, so that we can continue operating, continuing the flavor, the flavor of the restaurant." Lu Dep., ECF No. 208-3, at 44.

### B. Lu takes over the kitchen of Mimosa I

It is unclear how long after Li bought out Cheng's interest that Cheng and Yang continued to work in the kitchen at Mimosa I, but Lu testified that after their departure he assumed kitchen duties. Lu Dep., ECF No. 208-3, at 46. Lu testified that after they left, "it was Jackie and me, and then we hired another chef [Bing] to work with Jackie. There was also Manuel. Yeah." Id. at 43. Lu took on the role of head chef and oversaw the woks, the

5

sauces, and the sushi, despite the fact that he had no prior experience as a cook.[4] Lu Dep., ECF No. 208-3, at 14, 46. Lu asserts that in his capacity as head chef in 2009, he created certain secret recipes for which he claims trade secret protection in this case. Lu Dep., ECF No. 208-20, at 100. These recipes are set forth in an Excel spreadsheet. Ex. 16 to Lu's Dep., ECF No. 208-23; ECF No. 214-20 (Pls.' Ex. R-4). He testified these recipes came from Cheng and Yang but he incorporated "his own taste." Lu Dep., ECF No. 208-3, at 47. At the same time, he stated:

> [U]ltimately, we did not change the overall taste that the customers was [sic] accustomed to. We didn't want to—we didn't want the customers to sense that there was too much changes [sic], so we tried to keep their sauces or keep the previous ways as the basis to how we going to move forward.

Id. at 48. Indeed, while Lu claims to have "learned the process" from Cheng and Yang, he could not articulate anything he changed specifically about their recipes:

> Q. Is this a copy of their recipe?
>
> A. They didn't sell me this recipe, but I learned the process from them.
>
> Q. So you learned the shrimp with lobster sauce recipe from Mr. Yang and Ms. Cheng?
>
> A. Yes.
>
> Q. Did you add anything to it that's different from what they did?
>
> A. I believe so.
>
> Q. What?

---

[4] His prior work experience included working as a teller at a bank, as a waiter at several restaurants, and starting his own online vitamin business. Lu Dep., ECF No. 208-3, at 14-16.

6

> A. I don't recall right now. I don't recall particularly how they made it and how I did it.

Lu Dep., ECF No. 208-20, at 102.[5] More than forty pages of Lu's deposition transcript focus on these recipes and what makes them unique. Lu insists the secret is in the process[6]—Lu's particular way of making each recipe—but provides little detail as to what exactly about the process makes his recipes special:

> The secret is in the process it takes to make this dish, and nobody else makes it this way. Even though this dish may be a traditional dish that you will hear the name being used in other restaurants, but we did not have anything similar to other restaurants. I'm trying to recreate something based on my experience, based on my knowledge of how this dish—how this dish should be tasting.
>
> . . .
>
> There is a basis as to how this dish should taste and should look like. Every single company, every single restaurant has— perhaps they add different recipes to it, different sauces, perhaps they don't. Perhaps some or perhaps they all have peas. Perhaps it's all clear sauce. But the taste and what goes into it, the processes may all be different.
>
> Q. Help me understand the process. What are you talking about?
>
> A. That's secret.
>
> . . .

---

[5] At his deposition, Lu was presented with Exhibit 17, a handwritten list of ingredients for various sauces. Lu insisted these were Cheng and Yang's recipes that he and Li had purchased in the buy-out, which Lu believed had been lost. Lu Dep., ECF No. 251, at 151-52. Lu accused Shuman of stealing them. Id. at 152. Shuman's bookkeeper Alex Gibson stated in an affidavit filed as an exhibit to defendants' brief in opposition to plaintiffs' motion for summary judgment that he came across these recipes while cleaning up the restaurant's files in late 2015 or early 2016; he found them in a folder containing other documents stored in a rarely-used storage room. Gibson Aff., ECF No. 229-1, at ¶ 4.

[6] Again, the court notes that Lu learned "the process" from Cheng and Yang. Lu Dep., ECF No. 208-20, at 102.

7

. . . In my secret recipes there are maybe 50-plus secret sauces in here and processes, and every one is unique in its own special way. And there's nothing in here that is similar to anybody else's. And if you can find me one same sauce, show me.

Q. Well, that's your burden in this case, and I'm asking you, what is it about—help me understand. Is it—fried rice on the first page. Is fried rice your trade secret?

A. Yes.

Q. Fried rice is your trade secret?

A. The fried rice in here is my special way of making it. Nobody else makes this fried rice the way I make it.

Q. All right. Explain to me how your fried rice is different from everyone else's fried rice.

. . .

A. Fried rice will have cup eggs, carrots, peas and died [sic] onions. It's a very simple process. Just eggs, carrots, peas and onions. What is special about it is the sauce that goes into it. The sauce, nobody does it the way I do.

Q. All right. What about –

A. That's why I was willing to name it Mimosa's fried rice.

Q. What about the fried rice sauce is different from everyone else's?

A. The brown sauce, two quarts chicken stock, half cup sugar, five tablespoons salt, three tablespoons black pepper. That seems very simple. Sugar, salt, pepper, chicken stock, but what's special is my sauce. My sauce, if you go into the sauces and how the brown sauce is made –

Q. Let's do that. That's on page 4.007.

A. The brown sauce. Kikkoman soy sauce, 7 ladles. Golden Label Soy, sugar, chicken stock, Fujian wine, oyster sauce, Hoisin sauce, thick sauce, soy sauce, star anise seed, red

8

peppercorns, carrots, ginger, scallions, onions, chicken bones, whole, scallions. Fill a large pot with half water. As you can see, it's a very complex sauce.

Q. And explain to me what about the brown sauce is different from the way other people make brown sauce.

A. Actually, that's a – that's a process I'm not willing to share.

Q. Sir, you have to share it.

. . .

A. The secret is the way you process it and the combination of the different ingredients that go into it.

Lu Dep., ECF No. 208-20, at 102-07.

Lu acknowledges that every Asian restaurant has its own brown sauce. As to what makes his different from all the others, Lu testified: "There's a way of prepping it first, and then the combinations goes in afterwards. And based on the initials steps and when you add those sauces into it makes a big difference." Id. at 108. He went on to explain that the brown sauce forms the base for a number of other sauces and "sets the taste. It sets the uniqueness to my sauce, to my secret recipes." Id. at 111. According to Lu, it is therefore the most important. Id.

Lu testified these recipes and the menu at Mimosa I were set when Jackie began working as chef. Lu Dep., ECF No. 208-3, at 48; see Ex. 7 to Lu Dep., ECF No. 208-3. Throughout 2010 and 2011, Jackie, Bing, Manuel and Lu worked in the kitchen. Lu Dep., ECF No. 208-3, at 43.

9

## C. Shuman invests in Mimosa I

Never intending to operate the restaurant alone, Li and Lu began searching for new investors to help share the financial and day-to-day responsibilities of running the business after Cheng and Yang left. See Lu Dep., ECF No. 208-3, at 90-92; Li Dep., ECF No. 251, at 43-45. Enter defendant John Shuman.

Shuman was a regular customer at Mimosa I. Shuman Aff., ECF No. 208-1, at ¶ 6; Lu Dep., ECF No. 208-3, at 87-88. After he learned from Lu of the restaurant's financial problems, Shuman expressed interest in investing in the business. Shuman Aff., ECF No. 208-1, at ¶¶ 7-8; Lu Dep., ECF No. 208-3, at 88-89. In approximately April of 2010, Lu, on behalf of Li,[7] invited Shuman to purchase a 50% interest in the family business. Shuman Aff., ECF No. 208-1, at ¶ 8-9; Shuman Dep., ECF No. 208-4, at 243-44; Li Dep., ECF No, 208-2, at 36-37; Lu Dep., ECF No. 208-3, at 92. Li explained: "So we were thinking John Shuman is the local people in the community and has a lot of friend, and also he has his business experience . . . ." Li Dep., ECF No. 208-2, at 36. Likewise, Lu testified that Shuman "sold himself as somebody who is good with numbers, good with the books. And since he had years of experience as a businessman, I took his word that he was—he knows how to handle the QuickBooks or the financials." Lu Dep., ECF No. 208-3, at 91.

This was to be a side venture for Shuman. Shuman Aff., ECF No. 208-1, at ¶ 8. His primary business is running Shuman's Flag Car Service, which provides guidance for deliveries of oversized truck loads on interstates and local roads throughout the eastern United States. Id. at ¶ 1. Shuman's previous employment consists of work in a factory, as a

---

[7] The record contains a document that purports to grant power of attorney over Li to Lu. The document is signed by Li and dated May 1, 2009 but is not notarized. Ex. 4 to Li Dep., ECF No. 208-2; see also Li Dep., ECF No. 208-2, at 35.

butcher in a country store, in the construction and automotive industries, and for a coffee service business. Shuman Dep., ECF No. 251, at 234, 238-41. He has started several small businesses, including a farm that is still operational. Id. at 238-41. At the time he became involved in Mimosa I, Shuman did not have previous experience in the restaurant industry but testified that he loved Asian food and "cook[ed] a lot of it in [his] 20s, 30s" with a friend who was a chef. Id. at 236-37.

There is no partnership agreement between Li and Lu and Shuman,[8] nor is there formal documentation showing the amount of Shuman's investment. Shuman attests:

> We agreed that I would invest $70,000 and become an equal 50/50 owner of Mimosa I, with my ownership percentage increasing if I made additional investments. We also agreed that I would make direct payments of $35,000 to Jay [Lu]'s family members upon his request and that the remainder of the buy-in would be invested as direct payment of the operational costs for Mimosa I and in funding a new checking account. Jay told me that, at the time, Mimosa I did not have a bank account, line of credit, or any other access to outside finances, so my ability to pay for operational costs along the way was necessary and an agreeable form of investment.

Shuman Aff., ECF No. 208-1, at ¶ 9. Evidence of Shuman's financial investment in Mimosa I comes in the form of four checks—three made payable to Cai F. Park in the amounts of $5,000 (dated April 13, 2010), $10,000 (dated April 27, 2010), and $10,000 (dated May 5, 2010), and one $10,000 check made payable to Zhuo Xiong Lu (dated June 9, 2010).[9] Ex. 1 to Shuman Aff., ECF No. 208-1. Shuman explains:

> I made payments totaling $35,000 by check to Jay's sister and father. (Exhibit 1). I then funded a new checking account for Mimosa I in the amount of $5,000. I then made direct

---

[8] What appears to be an unsigned, proposed partnership agreement can be found in the record at ECF No. 214-10.
[9] The amended complaint alleges Cai F. Park is Li's daughter (Lu's sister) and Zhuo Xiong Lu is Li's husband (Lu's father). ECF No. 53, at ¶ 32.

11

> purchases, using my cash and my personal credit cards, towards operational costs for Mimosa I in the amount of $81,746.68 between May 2010 and May 20, 2011. Under the terms of our agreement, I made more than the necessary $70,000 investment that Jay and I had discussed and according to the terms that we had agreed upon.

Shuman Aff., ECF No. 208-1, at ¶ 10.

Lu, however, sees things differently. He testified Shuman

> had agreed on a buy-in amount of seventy plus—70,000 plus inventory, but I did not receive the full amount. And I pursued him on a regular basis to complete those transactions so we could have a legitimate business partnership going on. And he was supposed to be amended to that lease so that he could take on the liabilities of the restaurant as a business partner.
>
> And then he started—but because he took all the cash and all the money from the company every single day, he started to use that money. And he called it reinvesting into the business, and which I never agreed on doing so, but he was buying things in and out and stocking up the restaurant fully with the company's money. But then he's considered as his own investment. I just don't understand how he is so clever on how to increase his financial numbers.

Lu Dep., ECF No. 251, at 92-93.

A 2010 tax return for Mimosa Asian Fusion, LLC shows Shuman owning 98% of the partnership capital and Lu (rather than Li) 2%. Ex. 10 to Lu Dep., ECF No. 208-22. Profits and losses were said to be shared 60/40 between Shuman and Lu. Id. Li, however, adamantly disputes that she ever sold her shares of the business to either Shuman or Lu, and she accuses Shuman of misrepresenting her interest on these tax forms. Li Aff., ECF No. 214-12, at ¶¶ 5-6. As this is the only formal documentation of Shuman's ownership interest in Mimosa I, his stake in the company is unclear.

12

What is clear, however, is that Shuman was a member of Mimosa Asian Fusion, LLC. At the time Shuman became an investor, Mimosa Asian Fusion, LLC's corporate existence had been cancelled automatically by the State Corporation Commission on February 28, 2010. See Ex. 11 to Lu Dep., ECF No. 208-3. Lu testified this resulted from a late filing. Lu Dep., ECF No. 251, at 69-70. The LLC was reinstated on May 21, 2010. See Ex. 11 to Lu Dep., ECF No. 208-3; ECF No. 214-7. On the reinstatement form, Shuman replaced Cheng as registered agent for the LLC, and Lu signed the form as manager. ECF No. 20-1, at 20.

Also at the time Shuman became an investor, rent payments under the 2008 Lease Agreement were in arrears. Lu Dep., ECF No. 251, at 70, 91; Li Dep., ECF No. 208-2, at 22-23; Shuman Aff., ECF No. 208-1, at ¶ 12; Harner Dep., ECF No. 208-5, at 18; Cornett Dep., ECF No. 208-6, at 8. David Harner, Senior Real Estate Manager for Paramount Development Corporation, testified they "had difficulties collecting rent from Jay [Lu] from early on," but tried to work with him because they knew he was experiencing "a lot of hardship." Harner Dep., ECF No. 208-5, at 18, 25. R. Eric Cornett, Chief Operating Officer for Paramount, testified similarly: "[T]here were some months we'd get some payment, and some we'd get maybe none. But regardless, we never got made whole. We were always in the hole; i.e., a deficit in the amount of rent collected." Cornett Dep., ECF No. 208-6, at 8.

As of April 2010, Mimosa I was nearly $50,000 behind in rent. The landlord issued a notice of default under the 2008 Lease Agreement on April 9, 2010, giving Lu and the

13

restaurant 5 days to cure. Ex. 1 to Cornett Dep., ECF No. 208-6; Harner Dep., ECF No. 208-5, at 25. At that point, Lu sat down with Cornett and introduced him to Shuman.

> I think that's about the time when I – I went to Winchester, Virginia, sat down with Jay [Lu]. He introduced me to John [Shuman], and basically said John was going to be his partner, and that was enough of—again, we were looking for a reason to hope, why should we continue to work with you.
>
> You owe us $50,000, you haven't paid us, why should we continue? You give me a reason to stay in here and keep fighting with you. And that was my recollection. I had a – that was the reason he gave, was hey, I have a partner now who is going to help me, and also bring capital to the business to help.
>
> And so that was enough, I met John, asked questions, and, you know, it gave us enough of a reason for perhaps things were going to change that we did not exercise our rights at that time and said all right, we'll stay in here and fight with you a little bit longer and see if bringing John in here as a partner will help.

Cornett Dep., ECF No. 208-6, at 34; Harner Dep., ECF No. 208-5, at 40 ("Jay told me he had a partner and that was one of his many, many, many explanations as to how he was going to meet his financial obligations with us."), 72 ("Jay communicated to me that he either was going to or had decided to partner with one of his best customers.").

Shuman's entrance on the scene had a positive impact on at least this aspect of Mimosa I's financial condition. Cornett testified: "The most consistent we ever received rent was in the early days when John Shuman became a partner. We received rent like clockwork for a period of months when John Shuman became a partner with Jay." Cornett Dep., ECF No. 208-6, at 49. While Mimosa I made good on its current rent payments after Shuman became involved, it never fully caught up with the past due rent it owed. See

14

Shuman Dep., ECF No. 251, at 257-59; Cornett Dep., ECF No. 208-6, at 49, 74; Ex. 3 to Cornett Dep., ECF No. 208-6.

### D. The partnership dissolves

Meanwhile, relations between Lu and Shuman began to sour. Shuman claims to have

> quickly realized that the restaurant was being severely mismanaged by Jay [Lu]. For example, receipts and accounting documents that one would expect to find in a functioning business were nonexistent. Instead, Jay kept receipts, including crumpled and what appeared to be discarded receipts, in old fortune cookie boxes and in plastic shopping bags.

Shuman Aff., ECF No. 208-4, at ¶ 11. Shuman attests that in reconstructing accounting records from these old receipts, his bookkeeper "discovered a discrepancy of approximately $70,000 in unaccounted for cash, which appeared to have been withdrawn from Mimosa I by Jay." Id. at ¶ 14. Shuman claims to have confronted Lu about this discrepancy and suggested that a third party audit Mimosa's finances. Id. at ¶¶ 15-16.

Lu, however, insists it was Shuman who was stealing money from the restaurant.

> And then he started—but because he took all the cash and all the money from the company every single day, he started to use that money. And he called it reinvesting into the business, and which I never agreed on doing so, but he was buying things in and out and stocking up the restaurant fully with the company's money....
>
> . . .
>
> He had the books to himself for over about ten months before I got access to the numbers. The expenses that he is trying to consider as his own personal purchases for the restaurant, I disagree on. What I agree on is if the restaurant makes a profit, if it can afford to make large purchases to stock up a full restaurant before he took it over and kicked me out, kicked my mom out and stole our restaurant, then I do not agree on it.

15

Lu Dep., ECF No. 251, at 93-95. Lu testified that once he discovered the books were flawed, he sat down with Shuman to discuss the issue. Lu Dep., ECF No. 251, at 153. The minutes of that meeting are memorialized in a handwritten, highlighted list titled "Items Discussed on 4-29-11." Ex. 18 to Lu Dep., ECF No. 251. The list reads:

> 1. Prior approval of expense (including re-investment) (other than supplies)
> 2. Have a scheduled sit down once @ month for P+L + balance
> 3. No withdawls [sic] of money for personal use
> 4. Keep tips made as delivery, waiter,
> 5. [crossed out]
> 6. 13th of May go over 3-1 to 3-31 P+L, receipts basic sales to cost of goods salarys [sic]
> 7. Jay want wants [sic] a third part acct.
> 8. Get 10.00 @ HR for work we do + keep tips ourself.
> Must have written log.

Id. With respect to item number 3, Lu testified:

> No withdrawals of money for personal use. That's because I found out that he [Shuman] was taking whole bunch of money, cash, and he was withdrawing it for his own purpose without entering it into the records. To me that's called stealing, embezzlement of the company's money that we work hard, we invest all our time and money into. For him to take money like that and use for his own personal bills, I said no, that's not right.
>
> Q. Did Mr. Shuman express to you any concern that you may have been taking money from the restaurant improperly?
>
> A. He accused me of stealing hundreds of thousands of dollars in state court, I remember very clear, and that he actually withdrew that claim from the federal court. I don't know why. Perhaps he realizes that he couldn't make a claim of that.
>
> Q. It's pending in the state court, so we'll get to that when we get to that. Is it fair to say that you were pointing the finger at each other at this time?

16

A. At that particular time I was pointing finger at him.

Lu Dep., ECF No. 251, at 155-56.

Ultimately, the parties' relationship broke down entirely. Through a Craiglist ad posted May 17, 2011, Lu offered Mimosa I for sale for $215,000. Ex. 19 to Lu Dep., ECF No. 208-3. The ad reads:

> Fully operational with 3,600, square feet, full bar with an outdoor patio, seating 80 inside 20 outside, selling with all inventory, turn key ready to go, operations are 7 days a week, current staff in place are willing to stay on pending owner new owner relations. Modern contemporary design, bar seats 12, 24 foot fish tank, EVERYTHING IS INCLUDED!!! GREAT OPPORTUNITY FOR PROFIT POTENTIAL11111111

Id. Lu first explained in his deposition testimony that this ad was intended to get an idea as to the value of the restaurant, as Shuman had expressed interest in buying out Lu's shares and they disputed the business' value. Lu Dep., ECF No. 251, at 158. Lu testified:

> So we discussed ahead of time to see if maybe we should find a way to get valuation of the restaurant. And by the time that this was actually placed up onto Craigslist was because I realized Shuman was behind my back trying to squeeze me out, squeeze us out, stealing everything from us. We didn't want to lose everything.

Id. at 159. Lu went on to explain, however, that he placed this ad because he felt threatened "[t]hat Shuman was stealing the business from under us." Id. at 159-60. Shuman denies knowing anything about this Craigslist ad before it was posted. Shuman Aff., ECF No. 208-1, at ¶ 23.

Shuman claims that without prior warning on May 20, 2011, Lu abruptly closed Mimosa I and informed its employees that they were not to return to work the next day. Shuman Aff., ECF No. 208-1, at ¶ 17. The next day, Shuman arrived to find a chain and

17

lock on the doors. Id. He borrowed a bolt cutter to remove the chain and lock, and found that Lu had removed the point of sale server, as well as all licenses and operating permits from the premises, making it impossible to conduct business. Id. at ¶¶ 18, 22, 25. The restaurant remained closed for two weeks. Id. at ¶ 25.

For his part, Lu contends that Shuman "stole the business, call the police on us, took all the money from the bank, took all the cash from the cash safe, file all the documents with – illegally filing all the falsified documents with the government entities . . . ." Lu Dep., ECF No. 251, at 77; see also id. at 144, 155. Lu filed a complaint of embezzlement against Shuman on May 19, 2011. ECF No. 214-11; see Ex. 7 to Cornett Dep., ECF No. 208-6. Li and Lu filed their civil action against Shuman in Frederick County Circuit Court shortly thereafter. See Li v. Shuman, Case No. CL11000439-00 (Frederick Cnty. filed June 3, 2011).

On or about May 31, 2011, the landlord sent Lu notice of two defaults under the 2008 Lease Agreement—for 1) shutting the restaurant down and 2) nonpayment of $39,800 in past due rent. Cornett Dep., ECF No. 208-6, at 74. In a letter dated June 1, 2011 addressed to David Harney at Paramount Development Corporation, Lu wrote:

> I would like to inform you that we are not quitting the restaurant business. We have reasons to believe that we have been embezzled upon but the perpetrator has unlawfully taken control of the business accounting book and kept us in the dark as to the true financial conditions of the restaurant. We have closed the restaurant so that we can seek legal counsel and gather legal documents for court action.
>
> A complaint of embezzlement has already been filed with the Frederick County Sheriff Department against the suspected perpetrator on May 21, 2011 in case No. 11002999.
>
> We fully intend to continue the restaurant business and reopen the restaurant as soon as possible.

18

Ex. 7 to Cornett Dep., ECF No. 208-6. The landlord continued to exercise its rights and pursue its remedies under the Lease Agreement, however. Cornett testified:

> We were not getting in between the dispute between two partners. We were simply concerned, wait a minute, if the two partners in the business are having a squabble and the business is shut down, we've got a problem.
>
> Because this does not look good if your restaurant is closed. In the restaurant business, you know, that is a –the margin for error is very slim in the restaurant business, one that's already struggling, we knew, so we was like, wait a minute, there's not a lot of margin for error. If this restaurant is closed for very long, they will not recover.
>
> . . . [W]hen we knew the restaurant was closed, which Jay's letter and your letter to me confirmed that the restaurant was closed, as a landlord, based on our experience, we were like, uh-oh, we've got a problem.

Cornett Dep., ECF No. 208-6, at 77.

### E. Shuman forms Mimosa II

Without a way to operate Mimosa I, Shuman states that he "had to get everything in order to open a new restaurant on the premises." Shuman Aff., ECF No. 208-1, at ¶ 25. Thus, he formed a sole proprietorship, obtained necessary licenses and a permit to operate a business called "Mimo's Asian Fusion," paid off all outstanding bills totaling $20,000, and negotiated a new lease with the landlord. Id. at ¶¶ 26-28; see ECF No. 212-7, 212-10 through -11, 212-13 through -21. From the landlord's perspective, it was simply mitigating its damages under the 2008 Lease Agreement by entering into a new lease with Shuman:

> So that's what, you know, basically by signing a lease with John Shuman, we were envisioning—we viewed that as that we were mitigating our damages by re-leasing the space to try to again put, you know, somebody to operate the business. Not picking

19

> sides, one or the other, but just saying well, you know, we need
> somebody in here operating that business, and obviously that
> can pay rent.

Cornett Dep., ECF No. 208-6, at 80.

Mimosa II opened its doors on June 1, 2011. Shuman Aff., ECF No. 208-4, at ¶ 29.

Mimosa II served the same "traditional Asian-American dishes" served at Mimosa I. Id. at ¶

31. Jackie continued his work as chef at Mimosa II. Id. at ¶ 32. For $2,000, Jackie taught

Shuman his cooking techniques in a video that Shuman could replay as necessary. Id. at ¶

33; see Ex. 8 to Shuman Aff., ECF No. 208-15, -16, -17 (still shots of video).

Although he conducted business as Mimo's Asian Fusion, Shuman maintained the

original signage with the **mimosa** logo, stating he believed he was not allowed to move

any of the business property until Lu had satisfied the back rent owed to the landlord under

the 2008 Lease Agreement or the landlord took steps to foreclose on the property. Shuman

Aff., ECF No. 208-4, at ¶ 30. Shuman also asserts that orders entered by the Frederick

County Circuit Court required that he maintain and preserve all former property of Mimosa

I in its current location during the pendency of the state litigation. Id. at ¶ 36; see ECF No.

27-1, 27-2. Shuman formed a new limited liability company, Mimosa Restaurant, LLC, in

May 2012. Shuman Aff., ECF No. 208-1, at ¶ 29; see ECF No. 213-14.

### F. Li applies for trademark registration

Although she had not operated the restaurant in months, Li applied with the United

States Patent and Trademark Office (USPTO) for registration of the marks Mimosa Asian

Fusion and **mimosa** on December 22 and 23, 2011, claiming first use in 2008. ECF No.

231-2. The stylized font **mimosa** was registered on the Principal Register on October 2,

2012. The certificate of registration states "[n]o claim is made to the exclusive right to use 'Mimosa' apart from the mark as shown." Ex. 1 to Li Dep., ECF No. 208-2. Li amended her application to seek registration of the mark Mimosa Asian Fusion on the Supplemental Register, upon a finding by the examining attorney that the mark is descriptive. ECF No. 124-1, 124-2. The mark "Mimosa Asian Fusion Restaurant" was placed on the Supplemental Register on December 25, 2012. Ex. 1 to Li Dep., ECF No. 208-2.

Li testified she has not used these marks for any other business purpose besides operation of Mimosa I and has not used the marks since she was allegedly "cut out [of the restaurant] by the police" in May 2011. Li Dep., ECF No. 208-2, at 19, 34. And while she indicated in her interrogatory responses that she "intends to license the trademarks to startup restaurants," ECF No. 208-8, she testified she did not have plans to license the name Mimosa to other restaurants, Li Dep., ECF No. 208-2, at 38.

Defendants filed a separate proceeding before the USPTO to invalidate Li's trademark registrations on account of her "intentional failure to disclose the prior use of the mark by third parties and her intentional concealment of her non-use of the mark during the relevant time." Defs.' Br. in Support of Suppl. Mot. to Dismiss, ECF No. 124, at 5; see also ECF No. 159. Those proceedings have been suspended pending the outcome of the instant litigation and remain pending. See ECF No. 159-1.

The litigation in the Frederick County Circuit Court also remains pending. And, to the court's knowledge, Mimosa II is open for business.

21

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., No. 13-2044, 2014 WL 2871492, at *1

22

(4th Cir. June 25, 2014) (internal alteration omitted) (citing <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." <u>Anderson</u>, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" <u>Glynn</u>, 710 F.3d at 213 (quoting <u>Anderson</u>, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.</u>, 407 F.3d 631, 635 (4th Cir. 2005) (quoting <u>Anderson</u>, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." <u>Moss v. Parks Corp.</u>, 985 F.2d 736, 738 (4th Cir. 1993) (citing <u>Perini Corp. v. Perini Constr., Inc.</u>, 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

This federal action is predicated on two trademark infringement claims set forth in Counts 1 and 2 of the amended complaint. Li contends that defendants violated her trademark rights by using the mark "Mimosa Asian Fusion," or the confusingly similar mark "Mimo's Asian Fusion," and by using the stylized font 〰️ or the confusingly similar mark 〰️, in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a). In order to establish trademark infringement under the Lanham Act, Li must prove "first, that [she] owns a valid and protectable mark, and, second, that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation' of that mark creates a likelihood of confusion."

23

CareFirst of Maryland, Inc. v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006); see also

Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012).

## A.

> Trademark law, at a general level, protects the goodwill
> represented by particular marks, enabling consumers readily to
> recognize products and their source and to prevent consumer
> confusion between products and between sources of products.
> The marks enable consumers to make informed, independent
> decisions about quality and other product characteristics. But
> the law also protects the "linguistic commons" by denying mark
> holders an exclusive interest in words that do not identify
> goodwill attached to products or product sources but rather are
> used for their common meaning or meanings not indicative of
> products and product sources.

OBX-Stock, Inc. v. Bicast, Inc., 558 F.3d 334, 339–40 (4th Cir. 2009). "Thus, a proposed

mark cannot acquire trademark protection unless the mark is distinctive, that is, unless it

serves the traditional trademark functions of 'distinguishing the applicant's goods from those

of others' and identifying the source of the goods." Retail Servs., Inc. v. Freebies Publ'g,

364 F.3d 535, 538 (4th Cir. 2004). Four categories fall along the spectrum of distinctiveness.

In increasing order, they are: generic, descriptive, suggestive and arbitrary or fanciful. Id.

(citing Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984)).

Generic marks employ the common name of a good or service and are afforded no

protection under trademark law. Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464

(4th Cir. 1996) (citing as examples Convenient Store retail stores, Dry Ice solid carbon

dioxide, and Thermos vacuum-insulated bottles, a case in which a once-fanciful mark had

been assimilated into the language). On the other end of the spectrum are arbitrary or

fanciful marks. Fanciful marks are "made-up words expressly coined for serving as a

24

trademark." Id. (citing Clorox®, Kodak®, Polaroid®, and Exxon® as examples). Arbitrary marks are comprised of words of common usage that do not suggest or describe any quality, ingredient or characteristic of the goods they serve. Id. (e.g., Tea Rose® flour, Camel® cigarettes, and Apple® computers). Fanciful and arbitrary marks are inherently distinctive and do not require proof of secondary meaning. Id.

"Between the generic and the arbitrary or fanciful categories are descriptive marks and suggestive marks, which are often difficult to distinguish from each other." Retail Servs., Inc., 364 F.3d at 539. "Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product." Sara Lee Corp., 81 F.3d at 464 ("Coppertone®, Orange Crush®, and Playboy® are good examples of suggestive marks because they conjure images of the associated products" but do not describe the nature of the products the mark represents). Suggestive marks, like fanciful and arbitrary marks, are inherently distinctive. Id. Descriptive marks are not. They merely "describe a function, use, characteristic, size, or intended purpose of the product." Id. (citing, as examples, After Tan post-tanning lotion, 5 Minute glue, King Size men's clothing, and the Yellow Pages telephone directory). Descriptive marks are entitled to protection under the Lanham Act if they have acquired secondary meaning—"that is, if 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.'" Id. (noting Coca-Cola® is "probably the paradigm of a descriptive mark that has acquired a secondary meaning"). "A helpful rule of thumb is that 'if the mark imparts information directly, it is descriptive' but '[i]f it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive.'" Retail Servs.,

25

364 F.3d at 539 (internal quotation marks omitted) (quoting <u>Pizzeria Uno</u>, 747 F.2d at 1528 (quoting <u>Union Carbide Corp. v. Ever–Ready, Inc.</u>, 531 F.2d 366, 379 (7th Cir. 1976))).

Issuance of a certificate of registration by the PTO "arms the registrant with 'prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark.'" <u>Retail Servs.</u>, 364 F.3d at 542 (citing 15 U.S.C.A. § 1057(b) (West 1997)). It also serves as "strong evidence that the mark satisfies the statutory requirements for the distinctiveness necessary for trademark protection"—specifically, it provides prima facie evidence that the mark, at a minimum, is descriptive and has obtained secondary meaning. <u>Id.</u> (citations omitted). "Without a certificate of registration, the owner would be required to establish that the disputed mark was sufficiently distinctive to warrant trademark protection in the first place." <u>Id.</u> (citing <u>Pizzeria Uno</u>, 747 F.2d at 1529). Moreover, the presumption which registration gives the mark does not preclude a collateral attack, by way of affirmative defense or counterclaim seeking cancellation of the registration, from one charged with infringement. <u>Pizzeria Uno</u>, 747 F.2d at 1529.

**B.**

Li asserts she has a valid and protectable mark in both Mimosa Asian Fusion and the stylized font She claims she developed these marks before the restaurant first opened its doors and that the marks have been used in commerce since 2008. Li did not register these marks until December 2011—approximately six months after Shuman began operating Mimosa II. Li applied for trademark registration for Mimosa Asian Fusion on December 22, 2011, alleging first use in commerce on September 18, 2008. The mark was

26

placed on the Supplemental Register on December 25, 2012 (Reg. No. 4,265,943). Ex. 1 to Li Dep., ECF No. 208-2; ECF No. 231-2. She applied for registration for ~imosa on December 23, 2011, alleging first use in commerce on June 18, 2008, and the mark was placed on the Principal Register on October 2, 2012 (Reg. No. 4,216,849). Id. Li claims common law protection of these marks from September 18, 2008 to May 1, 2010. See Am. Compl., ECF No. 53, at ¶¶ 53, 81; Pl.'s Answer to Interrog. No. 1, ECF No. 231-1. In cancellation proceedings pending before the USPTO, defendants seek to invalidate Li's marks on account of her "intentional failure to disclose the prior use of the mark by third parties and her intentional concealment of her non-use of the mark during the relevant time." Defs.' Br. in Support of Suppl. Mot. to Dismiss, ECF No. 124, at 5; see also ECF No. 159.

### 1. *Mimosa Asian Fusion mark*

As the USPTO determined, the term Mimosa Asian Fusion is descriptive:

> Specifically, a MIMOSA is a mixed drink of champagne and orange juice. The term is descriptive of goods highlighted on applicant's menu, as shown on the specimen of use. ASIAN FUSION describes food that combines Asian cuisine with other types of cuisine, and descriptive of the types of food. . . . The mark, as a whole, describes the types of goods featured at applicant's restaurant, and are available for purpose with applicant's class 09 goods.

ECF No. 124-1; see Ex. 7 to Lu Dep., ECF No. 208-3; Lu Dep., ECF No. 208-3, at 36-37, 41; see also George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 395 (4th Cir. 2009) ("We are obligated to defer to the determination of the USPTO, which constitutes prima facie evidence of whether a mark is descriptive or suggestive.") Accordingly, the USPTO refused registration of the mark on the Principal Register. Id. Li then amended her

27

application to seek registration on the Supplemental Register. ECF No. 124-2. The USPTO accepted the amended application and placed Mimosa Asian Fusion on the Supplemental Register on December 25, 2012. Ex. 1 to Li Dep., ECF No. 208-2. "[R]egistrations on the Supplemental Register do not receive some of the advantages extended to marks registered on the Principal Register." George & Co., 575 F.3d at 392 n.8 (citing 15 U.S.C. § 1094). "In particular, unlike principal registration, supplemental registration is not prima facie evidence of the validity of the registered mark, of ownership of the mark, or of the registrant's exclusive right to use the registered mark in commerce." Id. (citing 15 U.S.C. § 1057(b)). Thus, Li bears the burden of proving validity of this descriptive mark and her exclusive right to use it. In order to do so, Li must prove secondary meaning.

"Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990). It exists if a "'substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise.'" Id. Proof of secondary meaning requires "vigorous evidentiary requirements." Id. The following six factors are relevant but not dispositive: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." Id.

Li began using the Mimosa Asian Fusion mark in 2008 in connection with the

28

operation of Mimosa I and did so for three years[10] until the business temporarily closed and Shuman began operating Mimosa II in June 2011. See Li Dep., ECF No. 208-2, at 34; Shuman Aff., ECF No. 208-1, at ¶¶ 17-25. Mimosa I's 2008 tax records show a business loss of $42,517. ECF No. 208-11. A $1,000 deduction for advertising expenses was taken. Id. Profit and loss statements from 2009 show total sales of $408,182.46, and net income of $22,383.34.[11] ECF No. 208-12; see also Pl.'s Ex. V-29.[12] Advertising expenses total $16,941. Id. Tax returns from 2010 show total sales of $337,045, a business loss of $42,196, and a $3,440 deduction taken for advertising. ECF No. 208-13. Profit and loss statements from 2010 show $340,064 in sales, a total loss of $24,705, and advertising expenses of $3,858. Pl.'s Ex. V-29. Profit and loss statements from January through May 2011 show sales of $144,911, net profit of $293, and advertising expenditures of $1,385. Pl.'s Ex. V-30.

These financial records prove that the success of the business between 2008 and 2011 was marginal at best, with revenues not exceeding $400,000.[13] The advertising expenditures were minimal and do not strongly suggest that advertising "cause[d] the public to equate the mark with the source of the product." Worsham Sprinkler Co., Inc. v. Wes Worsham Fire

---

[10] There is no evidence of exclusivity in the record. However, the court notes that on brief, Li acknowledges "there are several entities with the name Mimosa in Virginia," including "Mimosa Chinese Express LLC," which cuts against any argument of exclusivity. Pls.' Br. in Support of Summ. J., ECF No. 212-1, at 15.

[11] There does not appear to be a tax return in the record for 2009.

[12] Plaintiffs' Exhibits V-29 through -33 are referenced in their brief in support of motion for summary judgment as proof of advertising expenditures. See ECF No. 212-1, at 15. The court notes, however, that these exhibits do not appear to have been filed on the docket in plaintiffs' "First Batch," "Second Batch," or "Third Batch" of exhibits in support of summary judgment. See ECF No. 212, 213, 214. A hard copy of these exhibits was mailed to chambers along with plaintiffs' other evidence in support of summary judgment. The clerk was also able to recover a link to these exhibits on shared file hosting service OneDrive that had been emailed to the clerk and opposing counsel by plaintiffs' counsel on May 5, 2016 with the subject line "Link to download non redacted documents." Exhibits V-29 through -33 were not, however, subject to plaintiffs' motion to seal, which was granted, see ECF No. 216, 226, nor did plaintiffs' counsel ask the court to take any action as to these exhibits. The court is unsure how many other of plaintiffs' voluminous exhibits fall in the category of evidence sent to the court for consideration on summary judgment but not properly filed on the docket. **It is plaintiffs' responsibility to ensure their evidence has been properly docketed and made part of the record in this case.**

[13] Li offers no evidence of how this sales volume compares to the industry.

29

Protection, LLC, 419 F. Supp. 2d 861, 871 (E.D. Va. 2006). Indeed, as Li testified, "[a]dvertising expenses is not fixed, so if the income of the restaurant is better, and then we would spend more money on the advertising." Li Dep., ECF No. 208-2, at 29.

Li offers no consumer surveys to establish secondary meaning. Worsham Sprinkler, 419 F. Supp. 2d at 869 ("'[S]urvey evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning.'"); see Li Dep., ECF No. 208-2, at 30 (stating she never conducted any studies to determine whether the public associates the name Mimosa with her restaurant). Nor does she offer any consumer testimony evidence of secondary meaning.[14] As regards the fourth factor, Li points to the magazine article that appeared in the May and June 2011 edition of Around the Panhandle as evidence of unsolicited media coverage. See Ex. 3 to Li Dep., ECF No. 208-2. This article identifies Lu and Shuman as co-owners of Mimosa I but does not mention Li. Id. Of note, Li testified in

---

[14] Li testified she is unaware whether anyone in the community has been confused by Shuman's operation of Mimosa II and has only been asked by her friends whether she is still involved in the restaurant. Li Dep., ECF No. 208-2, at 34-35. Lu claims that people ask him "all the time" whether he is still running Mimosa I. When asked for specific names, however, he could not provide any:

> Maybe Betty, maybe Helen, maybe—I don't know. I don't know. I mean, I got a lot of people asking me these questions, and I would tell them the same things I'm going to tell you right now, that Shuman forced us out of the business, that he stole our property and we are no longer able to run it. We lost hundreds and hundreds and thousands of dollars.
>
> Q. What is Betty's last name?
>
> A. I don't know.
>
> Q. What is Helen's last name?
>
> A. I don't know.
>
> Q. Are those real people?
>
> A. You know what? Those are general names.

Lu Dep., ECF No. 208-3, at 145-46.

her deposition that this article was, in fact, solicited by Lu.  Li Dep., ECF No. 208-2, at 30-31.  There is no other media coverage of Mimosa I in evidence.  Likewise, there is no evidence of attempts to plagiarize the mark aside from Shuman's use of Mimo's Asian Fusion and Mimosa Restaurant, which are the subject of the infringement claims in this lawsuit.

On this record, Li cannot prevail on her trademark infringement claim as to the mark Mimosa Asian Fusion.  This mark is not inherently descriptive, and Li cannot meet the rigorous evidentiary standard required to establish the mark has acquired distinctiveness through secondary meaning—indeed, there is little to no evidence of secondary meaning.  Summary judgment therefore will be granted in defendants' favor on Count 1.  ERBE Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278, 1289 (Fed. Cir. 2010) (summary judgment appropriate where ERBE failed to present a genuine issue of material fact that there is secondary meaning for the mark).

2. ~~mimosa~~ mark

In contrast to Mimosa Asian Fusion, placement of the ~~mimosa~~ mark on the Principal Register serves as prima facie evidence of the validity of the mark and that the mark is sufficiently distinctive to warrant trademark protection.  It does not create "a per se issue of fact sufficient to defeat summary judgment," however.  Retail Servs., Inc. v. Freebies Publ'g, 364 F.3d 535, 543 (4th Cir. 2004).  Rather, the presumption has a "burden-shifting" effect.  Pizzeria Uno, 747 F.2d at 1529.  Defendants, as the party challenging the mark, must produce sufficient evidence to establish by a preponderance of the evidence that the mark is not entitled to trademark protection because it lacks the requisite distinctiveness.  Retail

31

Servs., 364 F.3d at 542. "If sufficient evidence of genericness is produced to rebut the presumption, the presumption is 'neutralize[d]' and essentially drops from the case, although the evidence giving rise to the presumption remains." Id. at 543. The burden of persuasion as to validity of the trademark remains with the plaintiff. Teal Bay Alls., LLC v. Southbound One, Inc., No. CIV.A. MJG-13-2180, 2015 WL 401251, at *8 (D. Md. Jan. 26, 2015), appeal dismissed (Aug. 19, 2015).

The court finds that defendants have satisfied their burden of rebutting the presumption of validity of the mark ⟨Mimosa⟩ and that Li has failed carry her burden of persuasion as to its validity for the same reasons discussed above. The mark consists of the word "Mimosa" (which both the court and the USPTO already have determined to be not inherently distinctive) in a particular stylized font. Defendants' evidence establishes that Mimosa I offered ten different kinds of Mimosa drinks on its menu, Ex. 7 to Lu Dep., ECF No. 208-3; Lu Dep., ECF No. 208-3, at 36, and that plaintiffs expected customers to see the name "Mimosa" and think of drinks, Lu Dep., ECF No. 208-3, at 41 (A. "I don't know what people expect, but I figure that if they see the name Mimosa, then perhaps in their mind it's related to drinks."). Indeed, the USPTO determined the term "Mimosa" "is descriptive of goods highlighted on applicant's menu." ECF No. 124-1.

Displaying the descriptive term "Mimosa" in a stylized font does not render it inherently distinctive, nor does this stylized version function independently of the term itself to identify the goods and services of Mimosa I from those of others. See Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d 1342, 1344 (C.C.P.A. 1977). This font "is 'not so distinctive as to create a commercial impression separate and apart from the term [Mimosa]'.

32

The record is devoid of evidence of public recognition of this overall format as a trademark." In re Northland Aluminum Prod., Inc., 777 F.2d 1556, 1561 (Fed. Cir. 1985); see also Retail Servs., 364 F.3d at 549. Indeed, there is no evidence that this particular stylization of the word "Mimosa" has acquired distinctiveness and the requisite secondary meaning to warrant protection under trademark law. On brief, defendants cite to several websites of Asian restaurants that use similar, stylized fonts. Defs.' Reply Br., ECF No. 231, at 4, 4 n.2 (www.mamafus.com; www.modernasiafrederick.com).[15] Stylized fonts are not unique to this industry, and based on the record evidence Li cannot establish that consumers would identify ⌐ℐⅈℳℴℴ𝓈𝒶 with the source of the goods. In short, "[t]he stylized nature of the mark cannot save it from ineligibility as [descriptive and lacking in secondary meaning]." In re: Cordua Restaurants, Inc., 823 F.3d 594, 606 (Fed. Cir. 2016) (appeal from final decision of PTO TTAB refusing registration of stylized form of mark CHURRASCOS).

While the certificate of registration of ⌐ℐⅈℳℴ𝓈𝒶 gives Li a presumption of validity, it is not conclusive proof of validity. See OBX-Stock, Inc. v. Bicast, Inc., 558 F.3d 334 (4th Cir. 2009) (finding, despite four certificates of registration on the Principal Register, that "all evidence points to the conclusion that the letters OBX were adopted, promoted, and received by the public as an abbreviation for 'Outer Banks,'" a geographically descriptive mark, for which there was no evidence of secondary meaning in the public's eye that OBX referred to plaintiff's products and not the geographic location itself). There is no evidence in this case to show consumers associate ⌐ℐⅈℳℴ𝓈𝒶 with Li or Mimosa I. Id. at 339-40

---

[15] Defendants also cite to www.sushijako.com which website appears to be no longer available; however, an internet search for the website suggests the reference is to a Harrisonburg sushi restaurant with a logo in a stylized font. See https://www.yelp.com/biz/sushi-jako-harrisonburg.

(trademark law "protects the 'linguistic commons' by denying mark holders an exclusive interest in words that do not identify goodwill attached to products or product sources but rather are used for their common meaning or meanings not indicative of products and product sources"). The court therefore will grant summary judgment in defendants' favor on Count 2 of the amended complaint.

## C.

Even if Li could prove validity of the ~~mimosa~~ mark, her trademark infringement claim would still fail as a matter of law. Li cannot succeed on a trademark infringement claim against her former business partner when the business dispute remains unresolved.

Li created this mark for the benefit of Mimosa Asian Fusion, LLC, and the LLC plainly had an implied license to use this mark. See Software Consultants, Inc. v. Rachakonda, No. 1:15-CV-1145, 2016 WL 234845, at *4 (E.D. Va. Jan. 19, 2016) ("The existence of an implied license is determined 'solely on the objective conduct of the parties.'"); Villanova Univ. v. Villanova Alumni Educ. Found., Inc., 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000) ("It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties."). As of 2010, Shuman was a member of this LLC and thus had a right to use the mark in connection with the LLC. "[A] party who holds a valid license to use a trademark and is not in breach of the license cannot be an infringer of the licensed mark." Software Consultants, 2016 WL 234845, at *3 (citing 4 McCarthy on Trademarks and Unfair Competition § 25:30).

34

To be sure, the implied license may have been revoked when the parties' relationship soured or when Lu closed Mimosa I's doors in mid-2011. It is likewise possible that in opening Mimosa II, Shuman may have used the mark in a manner outside the scope of the implied license. But those questions are inextricably intertwined with the underlying business dispute between Li, Lu and Shuman. Li cannot succeed on a claim of infringement against her former business partner when the disentanglement of partnership assets and rights flowing therefrom have not yet been resolved by the state court.

The case of <u>Kristin Marie Conolty d/b/a Fairway Fox Golf v. Conolty O'Connor NYC LLC</u>, 111 U.S.P.Q.2d 1302 (T.T.A.B. July 3, 2014), is instructive. The Trademark Trial and Appeal Board described the case as "essentially an ownership dispute" between former business partners over the mark FAIRWAY FOX for golf clothing. Kristin Marie Conolty d/b/a Fairway Fox Golf opposed registration of the mark by applicant Conolty O'Connor NYC LLC.

In 2008, Kristin Conolty and her friend Kathryn O'Connor began preparations to offer a line of upscale golf clothing under the trade name FAIRWAY FOX, a mark coined by Conolty's father. Using her fashion background, Conolty began designing clothing and working with vendors; O'Connor assisted and provided funding for the venture. Conolty obtained an employer identification number from the Internal Revenue Service as a sole proprietorship doing business as "Fairway Fox Golf." O'Connor registered the domain name fairwayfoxgolf.com which lists both Conolty and O'Connor as "co-owners" of Fairway Fox. Both are likewise identified as "founders" of the company on a business plan. Evidence established that Conolty and O'Connor had some involvement in both the fashion

side and the financial side of the business. Conolty O'Connor NYC LLC was formed in 2011 and bears the name of both Conolty and O'Connor. Ultimately, O'Connor became the sole member/owner of the LLC for reasons the Board found unclear. Nevertheless, even after the formation of the LLC in 2011, Conolty and O'Connor continued to work together and were perceived as a single enterprise: "Fairway Fox." The involved trademark application was filed by both Conolty and O'Connor in 2012. The parties stopped working together in May of that year, however, after a dispute over ownership stake in the company. They then went their separate ways providing two sources of FAIRWAY FOX products: Conolty began selling on etsy.com, doing business as Fairway Fox, and O'Connor selling through the company website. The mark was never assigned, transferred or licensed. Nor was there any contract addressing the disposition of the assets of the partnership or joint venture between Conolty and O'Connor upon its dissolution.

The Trademark Trial and Appeal Board's jurisdiction was limited to the issue of registration of the trademark. It held the application for registration by Conolty O'Connor NYC LLC was void <u>ab initio</u> because the applicant was not the sole owner of the mark. Prior to the 2012 application, "Ms. Conolty and Ms. O'Connor were, by any practical measure, partners, who jointly controlled the quality of FAIRWAY FOX products and who were both, together, perceived as the source of FAIRWAY FOX products." <u>Id.</u> at *8. Although the applicant LLC was controlled solely by O'Connor, the Board found Conolty had a joint interest in the mark. Conolty and O'Connor acted on behalf of the partnership or joint venture, and "[a]ny trademark rights resulting from the individuals' activities inured

to the benefit of the business, jointly owned by the individuals, rather than the individuals themselves." Id. at *10.

The same holds true in the instant case. At its core, this federal action is part of a larger business dispute between the parties that remains unresolved. Li used the ▬▬▬▬ mark solely for purposes of operating Mimosa Asian Fusion LLC and the Mimosa I restaurant. Shuman was a member of this corporate entity and was perceived as a source of Mimosa I products. See, e.g., Ex. 3 to Li Dep., ECF No. 208-2. Any trademark rights resulting from use of the mark inured to the benefit of Mimosa I, rather than to Li individually, and Shuman has a joint interest in those rights. Those interests must be sorted out in due course in the pending state court litigation. Li's federal trademark infringement claims, however, must fail as a matter of law.[16]

## IV.

Lu's trade secrets claim meets a similar fate. In Count 15 of the amended complaint, Lu alleges that he compiled a number of secret recipes in an Excel spreadsheet, prominently marked as "confidential," which were kept in the kitchen at Mimosa I for use by the kitchen staff. Lu claims Shuman obtained these trade secrets by improper means, disclosed them to his employees without Lu's consent, and now serves these dishes at Mimosa II, in violation of Virginia law.

---

[16] Not only did Li not have sole interest in the mark when she registered it in 2011, but at the time of her application she was not even using the mark. See Li Dep., ECF No. 208-2, at 30-34. Nevertheless, as defendants have already initiated cancellation proceedings, the court will defer to the Trademark Trial and Appeal Board as regards cancellation of the mark.

## A.

The Virginia Uniform Trade Secrets Act, Virginia Code §§ 59.1-336 et seq., entitles

an owner of trade secrets to damages when those trade secrets have been misappropriated.

A claim under the VUTSA requires proof of two elements: 1) Lu must prove the

information in question is a trade secret, and 2) that the trade secret was misappropriated.

MicroStrategy Inc. v. Bus. Objects, S.A., 331 F. Supp. 2d 396, 416 (E.D. Va. 2004). A "trade

secret" is defined in the statute as:

> [I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code Ann. § 59.1-336. "Misappropriation" for purposes of the Act means:

> 1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> 2. Disclosure or use of a trade secret of another without express or implied consent by a person who
>
> a. Used improper means to acquire knowledge of the trade secret; or
>
> b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
>
> (1) Derived from or through a person who had utilized improper means to acquire it;

38

(2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(4) Acquired by accident or mistake.

Id. "'Improper means' includes theft, bribery, misrepresentation, use of a computer or computer network without authority, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Id.

"The case law is clear that just about anything can constitute a trade secret under the right set of facts." MicroStrategy Inc. v. Bus. Objects, S.A., 331 F. Supp. 2d at 416. This includes recipes. "'The crucial characteristic of a trade secret is secrecy rather than novelty.'" MicroStrategy Inc. v. Li, 268 Va. 249, 262, 601 S.E.2d 580, 588 (2004) (quoting Dionne v. Southeast Foam Converting & Packaging, Inc., 240 Va. 297, 302, 397 S.E.2d 110, 113 (1990)). Therefore, to receive trade secret protection, Lu's recipes "'must be secret, and must not be of public knowledge or of a general knowledge in the trade or business.'" McKay Consulting, Inc. v. Rockingham Mem'l Hosp., 665 F. Supp. 2d 626, 634 (W.D. Va. 2009) (quoting Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 418 (4th Cir. 1999) (citations omitted)). Indeed,

> in order to have economic value, a trade secret must not be readily ascertainable through legitimate means. If a competitor could easily discover the information legitimately, the inference is that the information was either essentially "public" or is of de minimus economic value. The Commentary to the Uniform Trade Secrets Act, upon which the VUTSA is based, provides a number of proper means by which one could learn a trade secret. Most relevant to the instant case are the examples where one observes the product on public use or display or one reviews publicly available literature. What constitutes readily

39

> ascertainable through proper means is heavily fact-dependent and simply boils down to assessing the ease with which a trade secret could have been independently discovered.

Microstrategy Inc. v. Bus. Objects, S.A., 331 F. Supp. 2d at 417. "'The owner of a trade secret is not entitled to prevent others from using public information to replicate his product, nor may the owner prevent others from making similar products which are not derived from the trade secret.'" Microstrategy Inc. v. Li, 268 Va. at 262, 601 S.E.2d at 588 (quoting Am. Can Co. v. Mansukhani, 742 F.2d 314, 329 (7th Cir. 1984)).

## B.

Lu's claimed trade secrets appear on a 16-page Excel spreadsheet. See Ex. 16 to Lu's Dep., ECF No. 208-23; ECF No. 214-20 (Pls.' Ex. R-4). Three of those pages are marked with a bold **CONFIDENTIAL** stamp. At the bottom of the tenth page, in small font, the following sentence appears: "Information in is confidentiality, can not be shared without the consent from the orginal [sic]." Pages 11 through 15 of the spreadsheet contain similar language in small font at the top of each page: "Information is confidential, can not be shared without the consent from the original owner." The dishes listed on this spreadsheet include those one might expect to find at an Asian-American restaurant: Fried Rice, Veggie Tempura, Shrimp with Lobster Sauce, Moo-Goo Gai Pan, Pad Thai Noodles, Spring Rolls, Confucious Duck, Green Curry Thai, Korean BBQ Beef, as well as sauces such as General Tso's, Sweet and Sour Sauce, Honey Ginger Sauce, and Kung Pao Sauce. For many of these dishes, the spreadsheet contains nothing more than a short list of ingredients without reference to quantity. Other dishes list specific quantities of ingredients, but very few include actual cooking instructions. Indeed, the spreadsheet contains just a few terse

40

directions as to how to prepare particular dishes— e.g., "Vegetable oil sautéed fine garlic;" "Drain water 1st;" "Wait 3 minutes."

While Lu arguably can establish that he undertook efforts to maintain the secrecy of these recipes, he cannot meet his burden of proving this information "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Va. Code. Ann. § 59.1-336. Lu admits that the dishes set forth on this spreadsheet are common in Asian restaurants, Lu Dep., ECF No. 208-20, at 134-35, and he offers no evidence establishing how his recipes are different from those generally known in the industry. Indeed, Lu does not assert that he has put his own original twist on this typical Asian-American fare.[17] See Buffets, Inc. v. Klinke, 73 F.3d 965, 968 (9th Cir. 1996) (upholding district court's determination that chain's recipes lacked requisite novelty and economic value to be entitled to trade secret protection under Washington law, finding the recipes "were for such American staples as BBQ chicken and macaroni and cheese and the procedures, while detailed, are undeniably obvious;" thus, this was not a case "where material from the public domain has been refashioned or recreated in such a way so as to be an original product, but is rather an instance where the end-product is itself unoriginal"). Lu claims his dishes taste different than similar dishes at other restaurants but identifies no explanation for that difference or "secret ingredient" that makes his dishes unique. Cf. Vraiment Hosp., LLC v. Binkowski, No. 8:11-CV-1240-T-33TGW, 2012 WL 1493737, at **13-14 (M.D. Fla. Mar. 19, 2012) (rejecting argument that salted caramel brownie recipe is

---

[17] In fact, Lu, who has no formal training as a chef, learned these recipes from Cheng and Yang and is unable to describe what, if anything, he does differently than Cheng and Yang did. Lu Dep., ECF No. 208-20, at 102.

Case 5:14-cv-00030-MFU-JCH   Document 252   Filed 12/09/16   Page 41 of 45   Pageid#: 6693

trade secret "because it is comprised of a unique combination of ingredients" and that "one key secret ingredient" gave brownie its "unique taste," where the alleged secret ingredient was included in brownie recipe available on food website www.epicurious.com"), report and recommendation adopted, No. 8:11-CV-1240-T-33TGW, 2012 WL 1470309 (M.D. Fla. Apr. 27, 2012). To be sure, the lack of a "secret ingredient" is not fatal to Lu's trade secret claim. However, he points to nothing about his recipes or the ingredients that go into those recipes that gives him a competitive edge.

Rather, in his deposition, Lu insists that it is the process—his specific way of making each recipe—that is unique. Lu Dep., ECF No. 208-3, at 102-107. Yet he is unable to articulate anything proprietary about that process, stating only that "[t]he secret is the way you process it and the combination of the different ingredients that go into it." Id. at 107. General references to "the process" and "combination of different ingredients" are not specific enough to constitute a trade secret. See Little Caesar Enters., Inc. v. Sioux Falls Pizza Co., No. CIV. 12-4111-KES, 2012 WL 3190788, at *5 (D.S.D. Aug. 3, 2012) ("General references to preparation, timing, and amounts of food per hour to minimize waste is not specific enough to constitute a trade secret and would not classify as being 'not generally known.'"). Lu has not established how he derives economic value from this process aside from generic knowledge of cooking these common Asian-American dishes and running an Asian restaurant. Id. (finding Little Caesars had not distinguished how its system had brought specific economic value above and beyond the generic knowledge of how to run a ready-made pizza restaurant).

42

On this factual record, Lu cannot meet his burden of establishing that his recipes, or his process of making those recipes, are entitled to trade secret protection under Virginia law. Lu's conclusory assertion that his recipes are unique because they "came from my own brain, my own experiences that nobody has my experience to make that sauce the way I make it" cannot carry the day.[18] Lu Dep., ECF No. 208-20, at 115. There is simply no evidence that Lu's recipes or cooking process are in any way unique or derive independent economic value from not being generally known to or readily ascertainable by others in the industry.[19] Cf. Interbake Foods, L.L.C. v. Tomasiello, 461 F. Supp. 2d 943, 966 (N.D. Iowa 2006) (finding for purposes of preliminary injunction that Interbake's recipes and manufacturing processes with respect to ice cream sandwich wafers were protectable trade secrets under the Iowa Uniform Trade Secrets Act, noting the order and timing of Interbake's mixing process were "particularly key to making a consistently good wafer" and provide a "unique and unrivaled competitive advantage in the marketplace, as is evidenced by its large market share"); Uncle B's Bakery, Inc. v. O'Rourke, 920 F. Supp. 1405, 1428 (N.D. Iowa 1996) (finding for purposes of preliminary injunction that bagel maker's recipes, manufacturing and packaging processes to be "sufficiently unique" to constitute protectable trade secrets under Iowa Uniform Trade Secrets Act because "it is the only bagel maker to produce 'fresh, never-frozen' bagels for supermarket distribution, giving it a unique share of

---

[18] Moreover, this assertion appears to undermine Lu's claim that Shuman misappropriated his trade secrets. Lu testified in his deposition that the only way to make his special brown sauce is if he makes it himself, see Lu Dep., ECF No. 208-20, at 122-23, which raises the question of how, from a practical perspective, Shuman and his kitchen staff at Mimosa II could be making the same sauce. The court need not reach the issue of misappropriation in this case, however, because Lu cannot establish the information at issue meets the definition of a trade secret under Virginia law.

[19] Lu argues on brief that the article on Mimosa I that appeared on www.aroundthepanhandle.com serves as evidence of the economic value of these recipes. See Ex. 3 to Li Dep., ECF No. 208-2. A positive review of the food at Mimosa I does not convert Lu's recipes into legally protectable trade secrets. Lu has offered no evidence to establish these recipes are not generally known in the industry. In any event, Li testified that this article was solicited by Lu. Li Dep., ECF No. 208-2, at 31.

43

the grocery store bagel market"). As such, the court will grant summary judgment in defendants' favor as to Count 15.[20]

# V.

The court is sensitive to plaintiffs' plight. Li invested her savings, and Lu his time and energy, into a restaurant that Shuman now operates. Whether or not Shuman's takeover of the family business was lawful and whether plaintiffs are entitled to any recovery stemming from the dissolution of the partnership with Shuman are issues that must be resolved by the Frederick County Circuit Court. In short, this is not the proper venue for the parties' dispute. Plaintiffs cannot shoehorn a business dispute into a federal cause of action. There is no federal claim here.

As such, defendants' motion for summary judgment (ECF No. 207) will be **GRANTED**, plaintiffs' motion for summary judgment (ECF No. 212) will be **DENIED**, and this case will be **DISMISSED** from the active docket of the court.

---

[20] The court further notes that this claim is likely time-barred. Lu alleges that Shuman misappropriated his trade secrets "in committing conversion of Mimosa Asian Fusion, LLC." Am. Compl., ECF No. 53, at ¶ 346. That conversion occurred on or about May 25, 2011. See id. at ¶¶ 47-49, 121; see also Pls.' Resp. Br., ECF No. 135, at 28 ("Shuman stole all assets, businesses and equipment of Mimosa Asian Fusion, LLC into Mimo's Asian Fusion in May 2011."). A misappropriation of trade secrets action must be filed within 3 years after the misappropriation is discovered or by the exercise of due diligence should have been discovered. Va. Code Ann. § 59.1-340. The statute provides that "a continuing misappropriation constitutes a single claim." Id. Lu knew or should have known that the trade secrets had been misappropriated no later than June 1, 2011 when Shuman began operating Mimosa II. As plaintiffs did not file their complaint in this case until July 8, 2014, Count 15 is barred by the statute of limitations unless it was tolled by the state court matter. Lu asserts in his reply brief to his motion for summary judgment that he raised claims of trade secret misappropriation in a December 28, 2011 amended complaint filed in the state court action. See ECF No. 237-7. Based on the state court records publicly available, however, it is unclear to this court whether this amended complaint was properly filed. The issue need not be resolved, however, as Lu's trade secret claim fails as a matter of law.

44

An appropriate Order will be entered.

Entered: 12/09/2016

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge